Good morning. Our first case today is Bryan v. Govt. of the Virgin Islands, 18-1941. May it please the Court, my name is Richard Rocco. I'm here representing Ms. Bryan and Ms. Clark Thomas. If I may, I'd like to reserve five minutes for rebuttal. Is Section 7K's requirement that employees who had 30 years or more of service prior to October 1, 2011, that they pay an additional 3% towards their retirement violate the ADA because it coerced employees into retiring? The purpose stated by Mr. Herman, who was the Director of Personnel at the time that VIESA, which is the Virgin Islands Economic Stability Act, was enacted, he stated that it was designed, for lack of a better word, to penalize those employees who... Well, is that really accurate? I mean, didn't the legislative findings in the beginning of the act say that there's this much money at stake? The act does, Your Honor, say that there's $47 million identified with this specific group of employees with 30 years or more of service. But then it goes on to say that we need these people to retire. And then when you look at the way it's structured, they had two pieces to it. One piece of it was to offer an incentive of $10,000, which we don't challenge, because I think that's permitted under the ADA. But the second piece was the 3% piece, which said that, essentially, if you do not accept the $10,000 and retire and you remain on the payroll, then we're going to charge you this 3%. Wasn't the point of that to help make the pension system more solvent than it would otherwise have been? Your Honor, that was not a reason that was articulated by the government. The government did not take the position in this case that the purpose of the 3% was designed to shore up the finances of the retirement system. Where does that money go, the 3%? The money does go to... The 3% does go to the retirement system. So it sort of is obvious, then, that it makes it more solvent than it would be if that money didn't go into the GERS, right? Your Honor, that's correct. I mean, minimally so. You want them to charge your clients more than 3%? No, sir. So, I mean, the minimal is good for you, right? Well, I think... And this gets back to how the case was litigated. In the record, there's an expert report that we submitted that tackles this precise issue, assuming that it was going to be brought up. When the case was being heard and argued, the Virgin Islands disavowed that as a reason for this act. They said this was not... Because the number of employees that it affected were so small that it really wouldn't have a measurable impact at all in terms of the solvency of the plan. And our expert submitted a report wherein he says that you would never design a 3% provision like this if your intent was to shore up the finances. In fact, what you would do is if you wanted to increase 3%, you wanted to increase the solvency, you would increase it across the board to everybody, to every single government employee. And, in fact, that's what they subsequently ended up having to do. But isn't the target audience the higher-salaried employees? I mean, within their job category, they're going to be receiving the highest salaries, right? Well, that was what was discussed, but there was very little evidence of that introduced into the record. In fact, there's no evidence in the record that does an analysis of what these employees in this group that was targeted for the 3% what their wages were and how their wages compared to other employees. And that's sort of one of the points, one of the sort of issues that we take with the district court's opinion is that it talks about that as the basis for the cost-saving justification, the higher salaries. But all it uses is sort of an aggregate number. It uses a $47 million without really delineating on an individual basis what each of the individuals with 30 years or more service actually made. And as we point out in our blue brief, the regulations, the EEOC regulations on this point, it's 29 U.S.C. 1625.7, and it's talking about a reasonable factor other than age and what those factors are. That particular provision in subsection F, I think, of that, subparagraph F, states that you cannot use average compensation of a group as a basis for making a decision that would otherwise discriminate on the basis of age. That it is not a reasonable factor other than age to simply treat this group and say, well, they make $47 million, so therefore we're going to impose this penalty on them if they decide not to take the retirement incentive that we're offering. What do we do about the Hazen decision? Well, the Hazen paper decision is the decision that the court primarily relied on, and that is the question of whether you can divorce whether the years of service is analytically distinct from age. It is, according to Hazen. It is, according to Hazen. You have to accept that, right? Yes, that is correct, Your Honor, that the Hazen court does say that, at least in the context of that decision, the Hazen decision is a decision about vesting. If you look at the question that was presented to the court in Hazen, the question was, does it violate the ADEA for an employer to terminate an employee to prevent them from vesting in a pension? Based on that question, they answered that the arguments, at least, that were presented, what was happening was that in the Hazen paper case, I believe it's Mr. Biggins, I forgot the plaintiff's name, but in that case, the plaintiff was arguing that they were terminated shortly before they vested in their pension, and since they were 62 years old, that was obviously, the argument was, the inference there was that the purpose of terminating them was to prevent an older worker investing. The court there, I think, correctly said that, in that context, because you vest after 10 years, there's no correlation between vesting under the scheme that was in existence at the time, which is a 10-year vesting scheme, and age. They gave the example of an employee who could have been there for their entire life, they're intact, but yet, would also have the number of years towards vesting. That's where they decoupled it. In this case, and the reason we think this case is different, is because it's just not years of service, it's 30 years of service, and it focuses on a very particular group. Because of that- 30 years only affects people in the protected class, right? Because they're not hiring nine-year-olds. That's correct, Your Honor. That really, I think, strengthens your argument, but the other side of that coin that perhaps weakens your argument, correct me if I'm wrong, is that many people in the protected class, 50-year-olds, 60-year-olds, maybe 70-year-olds, are unaffected by the 3% contribution, because some of them have not achieved 30 years of service. That is correct, Your Honor, that there are likely individuals who are in the protected class who are unaffected by the 3%. But I don't think that's really the relevant question, what you look at. That argument is sort of a variation on the bottom line argument that this court in Carlo didn't accept, namely that what you're looking at is who are the people that are actually being affected by this. And then you do a comparison of those individuals, and I'm sort of slipping into the disparate impact analysis. But doesn't this get us back to Judge Restrepo's question, though? Because I think you framed it right. Whom does this affect? The answer seems to be people with 30 years of service. So it's a year of service issue, not an age issue, because it affects some people over 40, and it doesn't affect other people over 40 years of age. So how do you get out of the sort of haze and paper? I guess your answer is 30 years is different than 10 years? Well, that's part of the answer. No, go ahead. That's part of the answer. But I think the answer is, if you look at community services versus the Wingat Municipal Authority case, there the court takes up this proxy theory, and it looks at the different factors. One of the factors is, and perhaps the most important factor is, is the criteria that's being used here something that exclusively applies to only individuals in the protected class. And that's clearly met in this particular situation. And then you look at other reasons. For example, what's the purpose of the statute? The purpose of the statute in this case is clearly to coerce people into retiring. And that's an impermissible reason under Section 4F, I see that my time's up. That is an impermissible purpose under the Act itself. Under Section 4F2 of the Act, where it talks about voluntary incentive programs, one of the things that the Act makes clear is that you cannot have a voluntary incentive program that has within it a requirement or permits an involuntary retirement. The purpose of that provision is to prevent employers from adopting coercive measures that essentially force people into retirement when they're not, frankly, ready to retire. But is a reasonable factor other than age, I mean, can it be what the government contends, which is we need to shore up the system, we're undergoing a financial crisis here and we need to do something? That may be a reasonable, I'm not contesting that that could be a reasonable factor in some other situation, but the question presented is whether this Section 7K actually accomplished that or whether it was designed to do that. I mean, the testimony in the record from- But then Mr. Herman, I mean, I know you cited certain parts, but I got the sense looking at his testimony that he said there would be some significant savings here. There would be significant savings from the overall plan, incentive plan, and that's sort of the issue would be, do they have to have this punitive aspect to the plan? That's really what's being challenged here because they never really tested first what would happen, for example, if we offered a voluntary incentive program and offered people $10,000, which is what they did here, offered them $10,000 to this group of 30 or more to retire. How many folks would that get us towards the goal of cost savings? And I think it did, frankly, if you look at the numbers. You're saying they shouldn't have disclosed the 3% contribution at the same time they offered the $10,000 incentive? I mean, that seems harsher on the employee because you just can imagine many employees saying, well, gee, I wasn't really interested in the $10,000, but if they had told me I was going to have to contribute 3%, I would have taken the $10,000. So the whole notion that they should have just offered everyone the $10,000 and then seen what happened before they assessed the 3%, that seems sort of backwards from an employee rights standpoint. Judge Hardiman, if you accept the premise that the 3% penalty is lawful, then I agree with you that it should have been disclosed at the same time. But what we're challenging is the very premise that you can impose a 3% penalty on employees who do not take the retirement incentive because it's designed to punish them for not retiring. And that doesn't matter whether it's 3%, 2%, 1%? It does not matter, Your Honor. Okay, so your argument's clear then. You're saying that any requirement that employees in the protected class have to contribute something to their benefits, the total cost of their benefits, is ipso facto punitive and violative of the act? If it's focused on individuals who are in the protected class and it is not applied evenly across the board, we're not challenging the fact that the 3% would have been lawful had they said that every single employee who's participating in the retirement system will now have to pay an additional 3%. But wasn't there a quid pro quo here? They got $10,000 up front if they went out, correct? That's correct. Not everybody is offered the $10,000 up front? That's correct. So is it coercive or is it a voluntary retirement option? Well, it's coercive if you decide... The whole purpose of a voluntary incentive program is to let employees make the choice voluntarily if they're ready to retire. So the court, I mean, the statute itself recognizes that employers can offer incentives to retirement eligible employees that would incentivize them to take a retirement. That's what they did here. Well, here they did with the $10,000, but the 3% aspect, which is, it's sort of, I guess for lack of a better word, you can use a carrot, but you can't use a stick. And that's what's happening here. But can we evaluate the stick without considering the carrot when they're both offered at the same time? Don't we have to look at it holistically? I don't know if... I guess, sort of following up on Judge Restrepo's question, wouldn't this be a different case if there was no money offered to anyone to retire and they just said, look, if you've got 30 years of service, you have to start paying 3%? It would be... Well, in some respects, yes, it would be a different case, but I don't know if the fact that they didn't offer an incentive bonus changes the punitive nature. Because what we have here is we have employees who are 30 years or more of service, which is only individuals in the protected class, and only those individuals are being required to pay an additional 3%. Right now, they currently contribute, I believe, about 11% or 12% of their pay. It was 8% at the time of the act, and they've slowly increased it. So these employees still have to pay the incremental amount. And frankly, because it targets them, there's simply no... Or anything that's been offered, we think that that is facially violative of the act. Thank you, counsel. Thank you. May it please the Court, Suleymane Walker on behalf of the Government of the Virgin Islands. Good morning again. The government represents that Section 7K does not embody the evils or the ideas, the stereotyping of older workers, the negative perceptions of older workers that the ADA attempted to combat. In fact, the Government of the Virgin Islands specifically did not target its employees based on their age. The 30 years of credited service is specific to our GERS system. At 30 years of service for Tier 1 employees, you are able to retire with full benefits. These were the particular set of employees that were being targeted. As the panel discussed earlier, there are employees in the government system that were over the age of 40 that were not targeted or that were not affected by the additional contributions. How does it save you money if these folks could stop working and get full benefits? Right. Then you're going to replace them with someone who you have to pay something to. That sounds like it increased your costs, not decreases it. Overall, it did decrease the costs. How? Because a majority of those workers would have been at a higher salary than the employees that we would have brought in. Additionally, Section... But you're paying their salary, though, while they're not working, right? Well, GERS now takes on those retired employees. Okay, so it's not an expense of the Government of the Virgin Islands' payroll. It's a pension expense. Exactly. Not a payroll expense. Exactly. Those employees roll right on over to GERS and it's no longer on the government's payroll. Additionally... Okay, but where in the record, I think part of Mr. Roko's argument is that the record doesn't support the notion that this program saved the Government of the Virgin Islands money. What's your evidence to counter that? And how much money did you save through this program? I don't have that number, Your Honor. I did attempt to get that number and I was unable to actually get a figure. I would direct you to... I think Judge Hardiman is asking where in the record can we find it, not something he just came up with. Right. I would direct the panel to Mr. Herman's testimony that he did testify that there was substantial cost savings. I believe the number he testified to was 375 people retired. I believe that's the number that he gave. And that would have been a substantial change. I believe that's on page 24. Page 34, where he discusses that there was substantial cost savings. What about the disparate impact? Would you agree that it had a disparate impact on the protected class? I would agree that there were some members in the protected class that were affected and may have had a disparate impact. But there is a reasonable other factor, which is the cost savings. The evidence is clear, especially from the recitals, that the Virgin Islands was really in a precarious situation. Additionally, Section 7K wasn't an entity unto itself. It was not the only part of VIESA. VIESA also implemented a hiring freeze. It diverted some of the funds from local revenues directly to a general fund to assist with payroll. They didn't hire any retirees, which is something that the government did. They also made a concerted effort to collect a lot of delinquent taxes out there, whether it be property tax, excise taxes. So it was an all-inclusive attempt to shore up the government. Should we approach the territorial claims using the same matrix, or should we follow the district court's lead with respect to the statutory interpretation there? For the local claims, the government would present that our statutes borrow from the federal claims. So the mode of analysis of the local claims would mirror those of the federal claims, yes. But Judge Gomez took a different approach, as I recall. So are you suggesting we should follow his approach, or follow the matrix we've been discussing this morning? I believe that we should probably follow the matrix that we're discussing today, and really take a look at whether it was discriminatory or not. And even if it is, as we argue, it's not discriminatory based on the federal statutes, it's also not discriminatory based on the local statutes. It does raise an interesting issue, when you're looking at two Virgin Islands statutes, what do you do? Can one really violate the other? What do you think? It's a tough issue, I'm not sure what the answer is. It's okay if you don't know either. I think it is a tough issue. I don't, I can't say that if I were arguing below, that's the route that I would have taken in addressing that. I think the better argument would be that they're all in the same matrix. The Virgin Islands generally uses established statutes, like the ADA, to follow and to create our local statutes. So I think that may have been the better route. Additionally, the government wants to represent that, excuse me, that the Hazen paper analysis that age and pension are analytically distinct. And it's clear here, where we do have employees who are over the age of 40 that were not impacted. Additionally, the court below did not err in finding that Vaisa was not discriminatory. And we hope that this court as well finds that Vaisa is not discriminatory at all. If the court, I think Judge Hardiman has something for me. Yeah, I do. I do, Ms. Walker. I'm still sort of struggling with the record here. And I'd like to take you back to Herman's testimony at Appendix 18 and 19, because I just find it a little bit confusing. And I think the direct quotation is from Herman is, there was no cost savings with respect to implementation of the 3%. That 3% goes directly to GERS. There's no savings to the GVI. And shortly after he says that on page 19, he then says, I'm paraphrasing now, that the 3% contribution's purpose was to compel retirement eligible employees to leave the payroll and that there was, quote, a significant variance in pay, end quote, between a new hire and someone with 30 years of credited services. So I'm having trouble reconciling those two things. At first, he's saying there was no cost savings with the 3%, and then he says there's a significant variance in pay. Can you reconcile those for me? Judge Hardiman, what I would say is that my colleagues below rigorously opposed using this testimony because it was not, it was taken in the 8% case. What do you mean by that, taken at an 8% case? This testimony was not specific. It didn't come in specifically on Ms. Bryan or Ms. Thomas-Clark. It didn't come in then. It came in in the previous case, the related Vaisa case, for the 8%. And Mr. Herman was actually called by the unions, not by the government. Below Attorney Smith. I'm missing something here. So it was an 8% case, and in 8% there was no savings to the government? And this is a 3% case? No. Let me clarify. Okay. Vaisa also implemented an 8% reduction in the salaries of all executive and legislative level employees. That case is the case in which Mr. Herman testified. My colleague below argued that Mr. Herman's testimony shouldn't be brought in here because it was an 8% case, and additionally that he was called by, one, the unions, and two, he was not speaking on behalf of the government. That he was speaking, although he was the Director of Personnel at the time, she made the argument, and I agree with her, that he could not speak for the authors of Vaisa, and that Vaisa speaks for itself, the recital state, the purpose, and the goals of the statute. And those purpose, the purpose and goals of the statute included swapping out highly compensated workers in favor of lower compensated workers. And obviously when you do that, you save a lot of payroll. In theory, yes, but Vaisa also put in a hiring freeze. So when those workers went out, they weren't replaced. They weren't replaced, which saves even more money. Correct. There were, there was substantial savings. Those employees that went out were not replaced, the hiring freeze was also there, yes. But the higher compensated workers are the older workers. In general terms, yes, but that's... But there are other older workers that weren't... Correct. That were incentivized to leave with the 10,000 because they were lower cost workers. Exactly. So as I understand your argument, you're saying, we didn't treat these people the way we did because of their age. We treated them the way we did because they were expensive employees, and people that were the same age as them or older than them, who were not expensive employees, were not treated that way. Is that the crux of your argument? Yes. The crux of the argument is, we really only focus on 30 years of service. We were trying to get persons off of the government payroll. And with 30 years of service, they were retiring with their full benefits. They had reached their max capacity. And did that play a role too, that the government, when they were looking at 7K, they thought, well, there's no adverse financial impact because if they can go on the GERS and get paid full salary as retirees, they're not suffering an adverse economic impact. I would like to think that was a consideration. But there's nothing in the record to support that? No, your honor. Okay. All right. If there's nothing else on the panel. No, thank you, counsel. Thank you, your honors. Mr. Roker, could I ask you to start with what Ms. Walker said? Is it true that the folks that took the $10,000 incentive payment and retired, received retirement at full pay under the GERS? They did not receive full pay. What they received was an unreduced benefit. The retirement plan isn't a full pay plan, right? I believe it's about a 50% pay plan. So it may vary if you have 40 years of service. I think it goes up a little bit. When she said full benefit, I shouldn't have taken that to mean equal to their pay, but rather the maximum benefit available to people with 30-year services? Correct. And that's about 50% of their full pay? That's my recollection, your honor. I think we put the statute in the record. It specifies how you calculate the benefit. But it's about a 50% pay. Well, they fully vested is what it is. They fully vested after 30 years. Well, they're fully vested after 10. What happens is that for early retirements, typically the normal retirement age under the plan is 60. Most plans it's 65, right? But normal retirement under this plan is 60 years. You can retire under certain circumstances prior to reaching the age 60, right? If you reach, for example, age 50 and you have 10 years of service, you're allowed to take an early retirement. But it's reduced by a certain factor. There's a discount factor that's used to recognize that you're taking 10 years more of payments than you would have otherwise had if you had to wait until 60. There's a second provision, which is the 30-year and out provision, which used to be more common, but it's less common in defined benefit plans now. And that's a plan that says you can take basically a normal retirement, which is your full benefit, without any reduction if you have 30 or more years of service. Now, as a practical matter, that only applies to people in the protected class because everybody, there's no one under the age of 48 that belongs to the category of 30 or more years of service. Now, to respond to some arguments that my friend raised, the first question is, the position was that it doesn't embody that the Virgin Islands Legislature did not have a motive when it enacted this act. There are two answers to that. First, the facial challenge that we bring, motive is irrelevant. If the court concludes that 30 years or more of service was used to... There's nothing facially discriminatory on the act, though, right? I mean, it seems to me your disparate impact theory is stronger than the notion that there's facial discrimination here. Where does it say anything about age in 7K? Your Honor, you're correct. It doesn't specifically give an age limit, but the proxy theory for facial challenges says if you treat a certain category as a proxy, for example, if it had been Medicare. Right, but okay, so now we're back on the same page. If it's a proxy theory, though, how can something be a proxy when there are many people within the protected class whom are unaffected by this 7K? Well... That's sort of the definition of a non-proxy, or a partial, I guess maybe you're arguing partial proxy is sufficient. No, I'm not sure that we're arguing partial proxy. I think... But doesn't proxy mean if X, then Y? That what you... I mean, there are two bases for the proxy theory. Part of it is just the 30 or more years out. The reason it's a proxy under this court's precedent is several reasons. First is that it only applies to people in the protected class. There's no requirement that it need to apply to everybody in the protected class. What you're comparing when you're trying to do a proxy analysis is does this particular provision, who does it apply to? If it only applies and exclusively applies to people in the protected class and nobody outside of the protected class is affected by it, that is a very important consideration in deciding whether the requirement that's being used is being used as a proxy for age. The second reason is what's the purpose behind this provision? It is clear, and I don't think it's disputed, that they wanted people to retire. Well, he says there's a... This was a submitted, a consented record, right? So the government can't avoid or disavow Mr. Herman's testimony, right? That's correct. This was a stipulated record, right? That's correct. Well, they... So they take the good with the bad from the 2011 testimony, the 2011 case. But there is the testimony from Mr. Herman that there's a significant variance in pay between a new hire and someone with 30 years of credited service. So why doesn't that satisfy their evidentiary burden of showing that this saves money? Because it approaches it as an average cost approach, and that's under the EEOC guidelines. That kind of justification is specifically found to be unlawful, and our position would be that the court should defer to the EEOC's guidelines on this point, because the EEOC says that you cannot use an average cost approach of an entire group as a reasonable factor other than age, with one limited exception. That has to do with Rule 4F2 that deals with the equal cost, equal benefit rule, and that situation that you might be able to consider average cost. But in a situation like this, where the sole purpose here is to compel and penalize individuals who are not ready to retire, and that, I mean, if the ADA stands for anything, it should stand for the proposition that an employer may not force people into retirement. I think that's a strong argument, but force is, you know, if they offered your clients, you know, a million dollars to leave, are they compelled under the 3%? It sounds like you have to say yes, because it doesn't matter how sweet the carrot is. Your argument, as I understand it, is as long as there is a stick, and even if the stick is 3%, 2%, 1%, it is ipso facto illegal. That is correct. I do not think they can have a stick. Now, if they were offered a million dollars, I think I'd commit malpractice if I told them not to. That's why we use hypotheticals. But the reality is, I mean, that's not what happened here, right? Well, hey, look, we have a lot of people in the court system who are working not only for free, but at cost to themselves. And so I fully appreciate the desire of someone to find value in their work and remain gainfully employed. I'm completely with you on that, but I'm struggling with the notion that there's compulsion here. You know, the spectrum between incentive and compulsion is not crystal clear to me. And I guess at least you're trying to make it crystal clear by saying if there is a disincentive, a stick of any kind, it's illegal. Yes, and I think that rather than – another way to look at it is, should this older group of employees be penalized for their decision not to retire? They made that decision based on their own factors, their individual factors. And that's what the ADA tries to protect, not, oh, you can have a full retirement, therefore you're okay to retire. You can't make that kind of assumption. Each individual – they not – these individuals, like my client, were just not in a position to retire. And then – How many employees – how many clients do you have in this case? There are two clients. It's just these two, but we have others that are affected. Did you know how many people are affected by this? About – well, it's a dwindling number. Yeah, that's why I asked. Because as they get older, they – but the last count, it was about 55 people. So it's not a terribly large population. And what's at issue isn't a terribly large amount of money, but it's important to – it's money that's important to these individuals that we represent. All right.  Thank you. We thank counsel for their excellent argument and briefing.